RALPH TOMASOVIC, Plaintiff-Appellant, v. AMERICAN HONDA MOTOR COMPANY, INC., *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 87—1141

Opinion filed June 15, 1988.

Philip F. Maher & Associates, of Chicago (Philip F. Maher and Stephen E. McLean, of counsel), for appellant.

James K. Hortsman, Barry L. Kroll, J. Scott Myers, and Lloyd E. Williams, Jr., all of Williams & Montgomery, Ltd., of Chicago, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff Ralph Tomasovic brought a products liability action against defendant American Honda Motor Company, Inc., alleging that he sustained injuries arising out of a motorcycle accident caused by a defective motorcycle manufactured by defendant. A jury returned a verdict in favor of defendant, and the trial court entered judgment on the verdict. On appeal, plaintiff contends that the judgment is against the manifest weight of the evidence; that the trial court erred in admitting the defense expert's speculative opinion regarding tampering; that the trial court improperly denied plaintiff's motion *in limine* to exclude evidence of the speed limit where plaintiff's conduct was not in issue; that the trial court erred in not excluding testimony of a treating physician due to his *ex parte* communication with defense counsel prior to trial; and that the trial court erred when it failed to resolve the jury's request for clarification of jury instructions.

On April 29, 1977, plaintiff suffered burn injuries in a motorcycle accident in Schaumburg, Illinois. The issue of liability turns on evidence of whether the crash or a fire occurred first, and expert evidence regarding the gas cap assembly on the motorcycle. At trial, plaintiff sought to prove that the gas cap assembly was not

crashworthy and thus dangerously defective. He urged that the gasoline caught fire seconds after the crash forced open the gas cap. Defendant countered that the gasoline caught fire seconds before, and actually caused the crash. It argued that the gas cap was left partially open after plaintiff filled the tank just prior to the accident.

Dr. Raymond E. Hoffman, plaintiff's physician, testified for plaintiff regarding the burns plaintiff suffered. In reciting the history taken from plaintiff immediately after the accident, Dr. Hoffman testified he remembered that plaintiff "was riding his motorcycle and it exploded under him. And I remember the story he had to find a place to put a flaming motorcycle down when he was riding it."

Kathy Vanecko, an eyewitness, testified for plaintiff that she was walking near an intersection when plaintiff passed her. He was traveling at about 40 miles per hour. Just after he passed her, plaintiff lost control of the motorcycle and crashed into a house. She saw no fire on plaintiff or the motorcycle until after the crash.

Hiram Archibald, an eyewitness, testified for plaintiff that he was a passenger in a van driven by James Frasheski when he saw plaintiff's accident. Frasheski exclaimed, "Look at that," and at the same time Archibald saw plaintiff running to the street in flames. They were approximately 300 yards from plaintiff at the time they first saw him.

Plaintiff testified that he bought the motorcycle, which was used, one month before the accident and had ridden it three or four times. He had never owned a motorcycle before and did not have an owner's manual. He had driven various motorcycles and minibikes since he was in fifth grade. The day of the accident was the first time he had ever put gasoline into the motorcycle in question. On that day, he filled the tank and recalled that he replaced the cap when he was done. He testified, "With the palm, a firm motion down, hearing the click." He left the gas station, but did not look at the cap again. The accident occurred 7.8 miles from the gas station. During that time, plaintiff noticed nothing unusual about the gas tank and smelled no gasoline. Plaintiff testified that he lost control of the motorcycle when, traveling at 25 miles per hour, he attempted to go around a parked van.

Plaintiff denied telling a doctor that he saw a loose gas cap when he hit a bump. He denied reporting that the gasoline spilled out, causing his motorcycle and clothes to catch fire. He denied telling a doctor that he remembered the entire incident. Plaintiff also denied having worked on the gas cap with any tools.

Kevin Heinlein, an eyewitness, testified for plaintiff. He was play-

ing ball near the intersection when he saw the motorcycle leave the street and saw a ball of fire emerge when the motorcycle hit a house.

Donna Heinlein testified for plaintiff regarding events following the accident. Laura Ann Tomasovic, Matthew Stephan and Nathan Dorsey testified for plaintiff regarding the condition of the motorcycle before and after the accident. There had never been any previous problems with the gas cap.

Dr. Harry Peterson testified as an expert for plaintiff that defendant's gas cap assembly was dangerously defective. The locking device installed on the Honda motorcycle gas caps pursuant to recall worked to prevent the caps from opening. Dr. Peterson opined that if the recall locking mechanism was on plaintiff's motorcycle he would not have suffered burns in the accident.

Dr. Percy McDonald testified for defendant. In a *voir dire* outside the presence of the jury, the court heard testimony regarding pretrial communication between Dr. McDonald and defense counsel. The court allowed plaintiff's attorney to question Dr. McDonald privately and then permitted the witness to testify in court.

Dr. McDonald saw plaintiff in the emergency room on the night of the accident. Dr. McDonald wrote in the medical chart that plaintiff was "alert, oriented to time and place and cooperative." Plaintiff told Dr. McDonald that he remembered the entire occurrence. Dr. McDonald wrote down plaintiff's description of the accident:

> "Patient states that he was riding his motorcycle and noticed that the gasoline cap was loose and at the time he hit a bump ***. The gasoline spilled over and ran down to the engine [and] subsequently exploded destroying the motorcycle and also setting fire to the patient's clothes."

Kathleen Collins, a nurse, testified for defendant that she treated plaintiff in the burn unit on the evening of the accident. She recorded: "Patient states that cap on gasoline tank came off of cycle that he was riding, it blew up and he ran into a house." Collins testified that she did not edit plaintiff's statement, and took it down "word for word."

James Frasheski, an eyewitness, testified for defendant that he was driving a van near an intersection when he saw plaintiff 100 to 125 feet away. He saw the gas cap on plaintiff's motorcycle fly up and fly back down. When the motorcycle hit the curb, fluid poured out of the gas tank and ran down the right side of the motorcycle. Plaintiff pushed the motorcycle down, and stood up, on fire. Frasheski stopped the van and used a fire extinguisher from his van to put out the fire on the motorcycle.

Leann McRill, an eyewitness, testified for defendant that she was playing near the intersection when she saw plaintiff approach. She believed he was going "fast." She did not see the accident. Nicholas Steinbach, an eyewitness, testified for defendant that he was playing with other children when he saw the motorcycle hit the curb and travel across the lawn. Frasheski was on the scene with the fire extinguisher within two to three seconds.

Brian Gill, an assistant manager for safety and environmental activities for defendant, testified that a National Highway Traffic Safety Administration investigation of Honda gas caps was suspended in 1974 and has never been reopened. Prior to defendant's voluntary recall of gas caps for installation of locking devices, the Safety Administration had never requested a recall. The language contained in the recall notice was required by the Department of Transportation regulations.

Edmund Kababa, an engineer, testified as an expert for defendant that the latch hook on plaintiff's gas cap was fractured. It had come open before plaintiff left the road. He believed plaintiff could not have impacted the gas cap when the motorcycle hit the house because the knee impressions in the side of the gas tank showed that plaintiff was on the seat at the time of the collision. He could not have impacted the gas cap when the motorcycle hit the curb because he had to be in a normal seated position in order to brake and maintain the motorcycle in an upright position as he crossed the lawn. Another indication that the gas cap was already open when plaintiff reached the wall was the burn pattern on his body. The primary burns were on his front side, and thus he could not have been on top of, or in front of, the filler hole as the gas spurted out. The burns which reached his back were secondarily spread inside his jacket.

Kababa opined that the front hinge placement of the gas cap did not effect the injuries because the latch hood was broken and the cap was open before the impact. His opinion was not altered after considering Dr. Peterson's opinion that the gas cap should have been recessed and the cap should have had a lock.

According to Kababa, the latch showed a fracture of the latch hook. The check hook pin on the underside of the gas cap was distorted. To a reasonable degree of engineering certainty, the only way the check hook pin could have been bent without bending the latch pin was by exerting force between the pins. A screwdriver-sized lever would be narrow enough and strong enough to accomplish this.

Kababa opined that the deformation on the latch mechanism could not have been caused by the collision because there was nothing in

the accident mode which could have provided the specific force required to bend the pin in that manner. In his opinion, the motorcycle was not in an unreasonably dangerous condition when it left the factory. Kababa disagreed with Dr. Peterson's recommendations regarding the cap latch strength. In the 66 crash tests relied upon by Dr. Peterson, five reported fuel leakage, and none involved Honda double-action hinged caps. None of the tests showed that a cap could open upon impact from a rider.

■ Plaintiff initially contends that the jury verdict in favor of defendant is against the manifest weight of the evidence. A jury's verdict will not be disturbed on appeal unless it is clearly erroneous or against the manifest weight of the evidence. (*Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 504 N.E.2d 772.) A verdict is against the manifest weight of the evidence only if it is wholly unwarranted by the evidence or clearly the result of passion or prejudice. The relevant inquiry on appeal is whether the result reached is reasonable on the facts and evidence presented, and not whether other conclusions are possible. *Denton v. Allstate Insurance Co.* (1986), 152 Ill. App. 3d 578, 504 N.E.2d 756.

■ Frasheski's testimony strongly supported the jury verdict. Frasheski testified that just seconds prior to the crash he saw the gas cap loose. "I saw this cap fly up and fly back down." The motorcycle then struck the curb, and "fluid came out from the top of the tank and ran down the righthand side of the bike." He "saw fuel splash up from the tank." At that time, the right side of the motorcycle and the engine area ignited. The fire was initially on the engine, not on the rider's clothes. At that moment, plaintiff was in a normal riding position. Plaintiff skidded across the grass and driveway. As the motorcycle came down on its side, plaintiff "pulled himself off the bike at this point and came running away from the bike toward the street, and this is the first time he was on fire at that point. That's the first time I realized he was on fire."

Plaintiff attacks this evidence by characterizing Frasheski's statements at trial as a "fabrication of testimony." Plaintiff points to evidence of other eyewitnesses to contradict Frasheski. For example, plaintiff relies on the testimony of Kathy Vanecko, that she saw the crash before she saw any fire. Vanecko also testified, however, that when plaintiff passed her, his back was to her. Consequently, she did not know if the gas cap was open, and she could not see whether there was a fire on the right side of the engine. Vanecko also testified that plaintiff was not on fire below his waist. The hospital records, however, indicated that plaintiff suffered burns on his right leg, which

is consistent with Frasheski's testimony that the gasoline ran down the side of the motorcycle and ignited just before the crash.

In attacking Frasheski's testimony, plaintiff also relies upon Archibald's statement that he and Frasheski were not at the scene, but were "at least 900 feet away at the time the accident happened and could not see the accident." When confronted with Archibald's estimation, Frasheski did not alter his own estimation of 100 to 125 feet. Plaintiff points out that "Archibald further testified that Mr. Frasheski could not have seen the occurrence" because they saw plaintiff at the same time, which was after the crash. In a previous statement, however, Archibald said, "I didn't see it happen, you know; but [Frasheski] might. It's possible." In another pretrial statement, Archibald said, "Jim was the first one that noticed it, yes."

Plaintiff also highlights Frasheski's testimony at trial where he conceded on direct examination that he initially erred in a pretrial statement in specifying the time of the accident as 4:30. "After re-reading the statement and discussing it with my mother, my mother reminded me I got scolded for coming home late for dinner that day." Frasheski also testified that he erred in a 1980 statement in asserting that the gas cap came completely off the tank. At trial, he testified that the hinged cap "opened and closed."

Plaintiff further points to Frasheski's testimony that he never even saw plaintiff run out into the street following the crash. Frasheski actually testified that when he saw plaintiff pull himself off the motorcycle and come "running away from the bike towards the street," Frasheski brought the van to a complete stop and grabbed a fire extinguisher from behind the passenger seat of the van. He explained that he never saw plaintiff actually run into the street, because at that moment Frasheski was reaching for the fire extinguisher and exiting his own van.

The jury was entitled to believe Frasheski's strong and detailed testimony and to find any minor inconsistencies to not be determinative of the issue of liability.

■ Furthermore, Dr. Hoffman's testimony regarding the history plaintiff gave supports defendant's theory that the fire occurred prior to the crash. Dr. Hoffman testified:

> "My other recollection over the years is that I remember that Ralph was riding his motorcycle and it exploded under him. And I remember the story he had to find a place to put a flaming motorcycle down when he was riding it. That may not be accurate, but that's my recollection."

Additionally, on cross-examination, Dr. Hoffman stated that he relied

upon a history taken by Dr. McDonald following the accident. There was nothing in the history about crashing into a wall. The history stated that plaintiff "remembered the entire incident." While riding his motorcycle, plaintiff noticed "[t]hat the gasoline tank cap was loose, and at that time he hit a bump." The gasoline then "spilled over and ran down to the engine and subsequently exploded, destroying the motorcycle and also setting fire to the patient's clothes." The testimony of Dr. McDonald and of Kathleen Collins corroborates Dr. Hoffman's testimony.

Plaintiff maintains that the history taken by Dr. McDonald was not significant because he testified that "[f]rom a medical viewpoint, what we really need to know to take care of him was that it was a flame burn." We do not see how this substantially lessens the impact of Dr. Hoffman's testimony such that it would render the verdict against the manifest weight of the evidence.

█ █ In arguing that the jury verdict was against the manifest weight of the evidence, plaintiff relies heavily upon his expert witness Dr. Peterson's testimony, maintaining it was such that the manifest weight of the evidence established that the cap fractured at impact. He opined that the cap and tank were defective because of the absence of a locking device, and also because the location of the cap on the tank in a raised position made the cap susceptible to pelvic impact. Dr. Peterson criticized the hinging on the cap towards the front of the bike, the material used in the latch hook, and the spring-loaded mechanism under the cap. Dr. Peterson believed that the latch hook on the motorcycle had a casting defect which existed at the time the motorcycle was placed on the market and sold. The casting defect considerably lowered the amount of force it would take to break the gas cap latch hook.

As the basis for his opinion, Dr. Peterson relied on a series of studies on the question of motorcycle crashworthiness. Of the 66 motorcycle crash tests, however, only one had a hinged gas cap like the one at issue here. In that single test, the cap did not open or leak. Furthermore, no latch hooks had fractured in the tests, and the tests never indicated that a rider would hit a gas cap as he moved forward in a frontal collision.

The question of whether a product is unreasonably dangerous is usually a jury question in a products liability action, and this is particularly true where conflicting expert testimony is presented. (*Ebbert v. Vulcan Iron Works, Inc.* (1980), 87 Ill. App. 3d 74, 409 N.E.2d 112.) Defendant countered plaintiff's expert evidence with detailed and credible expert testimony from Kababa. He found the latch hook was

designed with sufficient strength and that the motorcycle was not dangerous or defective. Kababa pointed out that there was no indication of pelvic impact on the tank. The burn pattern on plaintiff indicated the gas cap was open before plaintiff moved forward off the seat. The latching mechanism showed the hook had been fractured by a prying force rather than during the accident. The presence of carbon material in the gouge indicated it had been made prior to the fire.

We cannot say the verdict is wholly unwarranted by the evidence. Instead, we must conclude that the evidence supports the verdict and the result reached is reasonable. We will not disturb the jury verdict.

■■ ■ Plaintiff next contends that the trial court erred in admitting Kababa's expert opinion that the latch hook on the gas cap was tampered with and fractured prior to the crash. Plaintiff maintains that the testimony was speculative. Kababa "admit[ted] that he was telling the jury that he did not know how or who or when this latch cap (hook) was fractured other than that it happened before the fire." Plaintiff argues that the "expert's unfounded suggestion that someone had tampered with the gas cap before the occurrence was highly prejudicial. It allowed the jury to conclude that the injury was caused by tampering when no such evidence existed." At trial, plaintiff argued to the court that the expert opinion should be excluded as fabricated testimony.

Where an expert opinion has no factual basis, the opinion is entitled to little weight. (*Anderson v. General Grinding Wheel Corp.* (1979), 74 Ill. App. 3d 270, 393 N.E.2d 9.) Kababa's opinion, however, was not speculative.

Kababa testified that the latch hook was fractured prior to the crash. A force was exerted between the check hook pin and the latch pin. At trial, Kababa noted gouge marks on the gas cap assembly. Based on a reasonable degree of scientific and engineering certainty, Kababa opined that the marks were made by "something stronger than the material of the cap, the latch itself, something like steel and would have to be a small, thin steel object to leave a small gouge like the gouge is." Kababa stated that it could have been made by the tip of a screwdriver. He then identified a Honda tool kit which comes with a 350-type motorcycle and noted there were three screwdrivers in the kit. He stated that when he scored on the cap button with a screwdriver it made the same type of mark as that on the plaintiff's cap.

Kababa testified further that the check hook pin had a slight distortion in it, but the latch pin had no distortion. He found this significant and, based upon a reasonable degree of engineering and scien-

tific certainty, he opined that the "force to cause this type of bending and no bending here had to be applied between two pieces." He agreed that a screwdriver was the right size tool for causing that force between the two parts. He determined this after conducting various experiments. Kababa explained the different types of distortion which could have been caused with a different type of force.

> "COURT: Well, he said an instrument like a screwdriver. I can't strike an expert's testimony. He is an expert.
>
> PLAINTIFF'S COUNSEL: I mean he has to have a foundation or basis.
>
> COURT: Well, the jury can believe him or not, but I am not going to strike it."

Kababa sufficiently testified as to the basis of his opinion. The jury was then entitled to determine whether or not that opinion deserved any weight. The relative weight and sufficiency of expert and opinion testimony is peculiarly within the province of the trier of fact to decide. (*Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 356 N.E.2d 565.) The weight and value of an expert opinion depends largely upon foundations of fact and reason upon which the opinion rests. (*Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 229 N.E.2d 171.) We hold that there was sufficient evidence for the trier of fact to find that Kababa's opinion had some foundation and was not speculative. See *Walczak v. General Motors Corp.* (1976), 34 Ill. App. 3d 773, 340 N.E.2d 684.

■■ The testimony of an expert is judged by the same rules of weight and credibility which apply to other witnesses. (*Brendel v. Hustava* (1981), 97 Ill. App. 3d 792, 423 N.E.2d 503.) A witness' testimony should not be completely disregarded unless it is so inherently improbable and contrary to the laws of nature or universal human experience so as to be incredible and beyond limits of human belief. (*Bucktown Partners v. Johnson* (1983), 119 Ill. App. 3d 346, 456 N.E.2d 703.) We cannot say that is the case here. Moreover, the jury is free to completely disregard the expert's conclusion of fact. (*Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154.) Whether or not the Honda tool kit's screwdriver or any other screwdriver was ever used to work on the gas cap assembly are issues for the jury to decide.

■■ Plaintiff objects to the fact that Kababa's opinion regarding tampering was not raised during his deposition and was first introduced at trial. His deposition is not before us and thus we cannot address this point.

■■ Plaintiff also maintains that cross-examination on this issue

was improper. Plaintiff called Laura Tomasovic on rebuttal to testify that she knew nothing about any possible tampering with the gas cap. On cross-examination, she was asked three questions. The first: "[If] [s]omebody pried up on the gas cap it wasn't you, is that correct?" She was then asked: "If someone tampered with that gas cap, it wasn't you?" The trial court sustained objections to these two questions, and struck them. The third question was asked without objection: "You didn't do anything to that gas cap, is that correct?" The witness replied, "No, I did not."

Plaintiff argues that the first two questions "were intended to convey improper information which is not in evidence and are so prejudicial and inflammatory as to merit the granting of a new trial." The court properly ruled, struck the questions, and directed the jury to disregard the questions. We find no prejudicial or reversible error.

Next, plaintiff contends that the trial court erred in denying plaintiff's motion *in limine* and allowing evidence of speed to be introduced. The motion *in limine* sought to exclude evidence that plaintiff was traveling at an excessive rate of speed and violating the speed limit of 25 miles per hour. Plaintiff maintains that evidence of a speed limit violation improperly placed the issue of plaintiff's negligence into this strict liability case.

At trial, plaintiff was first to introduce testimony regarding his speed. During plaintiff's case in chief, plaintiff's counsel elicited from Vanecko her estimate that plaintiff was traveling at 40 miles per hour when he passed her. On cross-examination she repeated this estimate with no objection from plaintiff. Plaintiff, Frasheski and McRill also gave estimates of road speed without objection. We conclude that plaintiff has waived the right to raise this issue on appeal. See *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 475 N.E.2d 817.

Plaintiff contends further that Dr. McDonald's testimony should not have been permitted due to his *ex parte* communication with defense counsel. (See *Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 509 N.E.2d 1376; *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232.) On September 16, 1986, Dr. McDonald met with defense counsel and reviewed plaintiff's hospital chart and discussed the history which he had recorded.

Dr. McDonald was not called as a treating physician. Instead, he had been an intern who took plaintiff's history. He was called as a person to whom plaintiff made an admission. He testified regarding that recorded admission. Thus, the *Petrillo* rule is not applicable.

Moreover, there is no allegation here that Dr. McDonald was in

possession of any confidential information from plaintiff or that he ever discussed confidential information with defense counsel. Plaintiff admits that the only subject at issue was the recorded history. We note that plaintiff's counsel was given unlimited opportunity to conduct examination on *voir dire* and to interview the doctor privately before he testified. Finally, we find it significant that the identical history regarding which Dr. McDonald testified was also brought out by plaintiff on direct examination of Dr. Hoffman. No error occurred.

Plaintiff finally contends that the trial court erred in its response to the jury's request for clarification of certain Illinois Pattern Jury Instructions. During deliberations, the jury sent out a note:

"Judge, can we have clarification of these three pages, specifically on the question of unanimous vote on points for plaintiff ***."

The note was accompanied by burden of proof, elements of damages, and issues instructions. The trial court and counsel conferred. The court suggested directing the jury to reread the instructions and inquire further if any questions remained. The court noted that, because they had waited an hour for a court reporter, it was possible that the jury no longer needed clarification. Defense counsel informed the court that its suggestion would be fine, and plaintiff's counsel also replied, "Fine." The court wrote the following note to the jury, and read it to counsel.

"To the Jury, please re-read each instruction very carefully. Resume your deliberations, and if you continue to have problems understanding them, contact me."

Plaintiff's attorney replied, "Okay," and reminded the court to return the jury instructions to the jury. The jury did not communicate with the court again. We find that plaintiff waived the right to raise this issue on review. (See *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 475 N.E.2d 817.) Moreover, the jury raised no explicit question of law. (*Gale v. Hoekstra* (1978), 59 Ill. App. 3d 400, 375 N.E.2d 456.) Thus, the court was not required to clarify the instructions. (*People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622.) The trial court acted properly.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

WHITE, P.J., and FREEMAN, J., concur.