Francis E. Dammann, Plaintiff-Appellee, v. Turner Cartage and Storage Company, a Corporation, Defendant-Appellant.

Gen. No. 11,819.

Second District.

April 29, 1964.

Maynard & Maynard, of Rockford (James F. Maynard, of counsel), for appellant.

Knight, Ingrassia & Roszkowski, of Rockford (Stanley J. Roszkowski, of counsel), for appellee.

MORAN, J.

This is a personal injury case in which the plaintiff was awarded damages of $14,500. The defendant appeals, claiming that the trial court erred in refusing to strike a portion of the complaint, that erroneous jury instructions were given and that the verdict is against the manifest weight of the evidence.

In June, 1961, the Rockford Clutch Company was in the process of moving its plant and equipment from Rockford to Loves Park, Illinois. The Appellant in this case, Turner Cartage and Storage Company, had a contract with the Rockford Clutch Company to move the equipment. Appellant, in turn, hired trucks and drivers from the Blue Line Transfer Company of Rockford. Appellee, the plaintiff below, was one of the drivers furnished by Blue Line.

Part of the equipment to be moved consisted of a large number of steel storage cabinets or bins used

for the storage of parts, tools and the like. These bins had adjustable shelves which were inserted by means of clips which fitted into slots. The shelves could be removed by exerting upward pressure, thereby disengaging the clips from the slots. The usual manner of exerting such pressure was to strike the shelf an upward blow with a hammer. Appellant's employees handled the transportation of these bins from inside the plant to the loading area and onto the flat bed trucks furnished by Blue Line. The Blue Line drivers then transported the bins to the new plant at Loves Park.

The job of carrying the bins from inside the plant to the waiting trucks was handled by means of a fork lift truck. This is a four wheel vehicle with two steel prongs extending from the front end. The prongs are hydraulically adjustable, both horizontally and vertically. The practice of Appellant's employees was to insert the prongs under the bottom shelf of the bin, raise the prongs so that the bin was off the floor, and thus carry the bin on the lift truck to the loading area, where it would be lifted hydraulically onto one of the Blue Line flat bed trucks.

Because the shelves in these bins were designed to come apart when upward pressure was applied, a number of the bottom shelves did come loose in response to the upward pressure from the forks. This, of course, would cause the whole cabinet to fall at least as far as the next shelf up. To meet this problem, Appellant's employees devised three safety measures. First, they would examine the bin before lifting it to determine whether it was tightly put together. Secondly, in the event the bin appeared "flimsy," they would place a skid, consisting of 2 x 4's or 2 x 6's, under the bin, and then lift the skid, thereby avoiding contact with the bottom shelf. (The bottom shelves fitted into slots which were several inches above the lower ends of the vertical portions of the cabinets.)

The Turner Company crew had moved hundreds of the bins at the Rockford Clutch plant prior to the accident in question, and skids were used for about one third of them. Finally, Appellant's employees adopted a practice of having a man hold each end of the bin as it was being transported, so as to balance it and prevent it from tipping forward or falling. This procedure proved its worth on several occasions when these "safety men" managed to hold a bin which had started to collapse.

On the occasion in question Appellee drove his Blue Line truck to the loading area to pick up some of the storage bins. He had nothing to do with bringing the bins to his truck, or loading them onto the truck. His only function was to transport them once they were on his truck. The Turner Company employees selected a bin—one of the larger ones, about seven feet high, eight feet long, eighteen inches deep, and weighing between 600 and 800 pounds—and decided that it looked sturdy enough so that no skid was required. The fork was inserted under the bottom shelf and the cabinet transported by lift truck some 200 feet to Appellee's truck. When the lift truck arrived, Appellee was on the bed of his truck moving some lumber and chains out of the way to make room for the bin. As Appellee was bent over picking up these items, the bin was poised on the forks over the bed of his truck, ready to be lowered. The two "safety men" who had accompanied the bin as far as Appellee's truck now busied themselves with other tasks. One of them may have had a hand on one end of the bin as it loomed over Appellee's truck, but he was primarily engaged in giving signals to the lift truck operator. The other safety man stepped away from the bin altogether. What happened next is perhaps

best described by Dominic Casarotto, the driver of Appellant's fork lift truck:

"After we got the cabinet about six or eight inches above the bed of the truck, with the fork lift in the center of the cabinet, and had raised it above the bed of the truck, I was setting there with the cabinet in the air, the truck driver was clearing 4 x 4's and so on off the truck, so that I could set it there, and as I was setting there the thing just collapsed on the opposite side. The shelves just gave way and I hollered, 'Look out. Get out of the way. It is coming apart.' And that is what happened. It was about a tenth of a second from the time it began to collapse until the time I hollered and it hit the bed of the truck. I heard Dammann hollering and I ran around to the side and it must have struck him. The bottom shelf of the cabinet collapsed. The bottom shelf was setting on the forks themselves. The shelf that was setting on the clip slipped out of the clip and that caused it to tip over. These cabinets were about seven or eight feet high. The fork lift was raised at the time of the collapse about three and a half feet off the ground. The top of the cabinet was about eleven and a half or twelve feet off the ground."

Casarotto, who has had some twenty years experience in driving trucks and moving heavy machinery, testified that in his opinion this bin would not have collapsed if a skid had been placed under it. No question is raised on this appeal concerning the propriety of this testimony. Leon Souva, employed by Appellant as a machinery mover, was the safety man nearest the bin when it fell. He testified that he "might" have had his hand on it. He also testified, without objec-

69

tion, that there should have been a man holding onto each end of this bin.

Appellee's complaint, filed November 28, 1961, alleged that Appellant, through its employees, was negligent in one or more of the following respects.

"a. Attempted to move more sections of steel storage bins than was safe under the circumstances.

"b. Overloaded the lift truck so that it was difficult to control.

"c. Failed to use due care in lifting the storage bins.

"d. Failed to keep a proper lookout for the plaintiff.

"e. Failed to keep the lift truck under control."

Appellant filed no motion attacking the sufficiency of the complaint. It filed its answer to the complaint on December 13, 1962, denying each allegation of negligence. The case proceeded to trial on December 13, 1962, the same day the answer was filed. The record before us does not show the date of service nor provide any explanation of the thirteen-month interval between the complaint and the answer.

Appellant contends that the charges of negligence designated "a," "b," "d" and "e" were not proved by the evidence. As to "a," Appellant points out that only one bin was being moved at the time of the accident, and that this bin was a single unit, not divisible into sections. Appellee does not contend that more than one bin was being carried at the time of the accident, and, in fact, makes no answer to this argument of Appellant. We agree with Appellant that the evidence failed to bear out this allegation.

In regard to allegation "b," that the lift truck was overloaded so that it was difficult to control, Appel-

lant points out that the lift truck and the forks were stationary at the time of the accident, and that no problem of "control" was involved so far as the lift truck was concerned. There is certainly evidence tending to show that the lift truck was loaded in such a manner that the *load* was difficult to control, but this is not the sense of this particular allegation. Appellee makes no effort to argue that the evidence supports this charge, and we think Appellant's point is well taken.

As to allegation "d," that Appellant failed to keep a proper lookout for Appellee, Appellant agrees that the lift truck operator's view of Appellee was obscured by the bin, but points out that the operator knew Appellee was there, and the operator's inability to see Appellee was not causally related to the accident. Appellee does not suggest any causal relationship, nor does any occur to us. We must agree with Appellant, then, that the evidence fails to show negligence or proximate cause as to this charge of the complaint.

Allegation "e," that the operator failed to keep the lift truck under control, is similar to "b," and the same conclusion applies. Appellee, again, does not attempt to persuade us that the evidence supports this charge.

We come, then, to the only remaining charge of negligence:

"c. Failed to use due care in lifting storage bins."

Appellant argues that this allegation should have been stricken, since it is not a charge of specific negligent conduct, but, rather, a mere conclusion of the pleader. Appellant cites the decision of this court in Altpeter v. Virgil State Bank, 345 Ill App 585, 104 NE2d 334 (2d Dist 1952), which we think is inapposite. The plaintiff in that case was a bank customer who was

shot by a robber during the course of a robbery of the bank. His complaint against the bank alleged that the bank "negligently and carelessly failed to take sufficient precautions so as to safeguard the regular customers of the bank, while upon its premises, from the danger of injury or loss due to armed robbery . . . ," without alleging what precautions the bank failed to take or could have taken, and without alleging any facts at all from which negligence on the part of the bank could be inferred. The trial court entered *judgment on the pleadings,* and the only thing before this court was the question of whether the complaint stated a cause of action. We held that the allegations of the complaint failed to show a duty on the part of the bank, failed to show that the bank was negligent, and failed to show that any act or omission of the bank was a proximate cause of the injury. In other words, the complaint failed to state any of the necessary elements of a negligence case. We noted that, in the context of such a complaint, the charge that the bank had "negligently and carelessly failed to take sufficient precautions. . ." was a mere conclusion of the pleader.

The instant complaint sufficiently alleges the elements of duty and proximate cause. The only question is whether the element of negligence is sufficiently stated in the allegation that defendant "failed to use due care in lifting the storage bins." We hold that it is, because a general allegation of negligence is sufficient. Chicago City Ry. Co. v. Jennings, 157 Ill 274, 41 NE 629 (1895); Eizerman v. Behn, 9 Ill App2d 263, 273, 132 NE2d 788 (1st Dist 1956); Church v. Adler, 350 Ill App 471, pp 480, 481, 113 NE2d 327 (3rd Dist 1953). See Note, 1953 Law Forum 668, "Allegation of General Negligence Sufficient to State a Cause of Action."

72

■ ■ If a party defending against an allegation of general negligence feels that he needs a more particularized statement of the charge in order to avoid surprise and prepare for trial, appropriate motions can be made for that purpose. Ill Rev Stats c 110, §§ 42, 45 (1961). In the instant case, however, Appellant's motion to strike was made for the first time during the conference on jury instructions, after the proof was in and both sides had rested. There was no need at that point to prepare for trial or avoid surprise. Appellant had already been to trial. The evidence was no mystery, no surprises were possible. Under these circumstances, Appellant certainly was not prejudiced by the denial of his motion and we hold that the action of the trial court was proper.

■ Appellant's next contention is that the court erred in giving plaintiff's instruction 13 on the issues (IPI 20.01) and plaintiff's instruction 15 (IPI 21.02) on the burden of proof. Instruction 13 set forth the various charges of negligence in the complaint, including charge "c," that Appellant "failed to use due care in lifting the storage bins." Instruction 15 then told the jury that plaintiff was entitled to recover if, among other things, he had proved "that the defendant acted, or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting, or failing to act, the defendant was negligent." Appellant complains that the combination of these two instructions permitted the jury to "wander afield and speculate at random upon the acts of negligence or omissions, if any, of the defendant 'in failing to use due care in lifting the storage bins.'" If there were no evidence of negligence in connection with the lifting or moving of the storage bins, Appellant's point would be well taken. However, we believe the evidence was sufficient to show negligence on the

73

part of Appellant in failing to use a skid and in the failure of the "safety men" to balance the bin while it rested on the forks of the lift truck. This would come within the category of "failure to use due care in lifting the storage bins." A large proportion of the total testimony taken at the trial had to do with the skids and the safety men, and we cannot believe that the jury was in any doubt as to what evidence there was to support the charge of failure to use due care in lifting the bins. Appellant makes the point that since instruction 13 refers to "bins," in the plural, the jury could have been misled as to which bin was meant. The jury was adequately instructed on the requirement of proximate cause, and, in any event, we can think of no reason why the jury would have been confused as to which bin was involved.

██ Finally, Appellant contends that the verdict of $14,500 is excessive. The evidence shows that Appellant sustained contusions and lacerations to one of his kidneys in this accident. Upon examination it was discovered that there was a pre-existing disease in this kidney, known as hydronephrosis. Appellee had experienced no prior difficulty with the kidney, and, even after the accident, it was functioning to some extent. There is no evidence that this condition of hydronephrosis would alone have required eventual removal of the kidney. Similarly, the lacerations and contusions would not have required removal had the kidney been normal. However, the trauma to the diseased kidney did require removal in the judgment of Appellant's doctors, and the kidney was removed. The medical testimony indicates that the load on the remaining kidney will now be doubled. This, of itself, causes no problem, since a normal kidney is capable of twice the work it is ordinarily required to do. However, should any trouble develop with the remaining kidney, serious consequences would ensue.

Appellant's medical bills and lost wages amount to $3,531.

The question of damages is ordinarily one of fact for the jury, and the court will not substitute its judgment for that of the jury. Olofsson v. Wood, 32 Ill App2d 32, 50, 161 NE2d 681 (2d Dist 1959). We see nothing to indicate that the jury in this case was motivated by passion or prejudice, and, accordingly, we decline to interfere with their verdict.

The judgment of the Circuit Court of Winnebago County is affirmed.

Affirmed.

ABRAHAMSON, P. J. and CARROLL, J., concur.