JAMES REYNOLDS, Plaintiff-Appellant, *v.* AMERICAN OIL COMPANY, Defendant-Appellee.

(No. 59881;

First District (2nd Division)—September 30, 1975.

*Rehearing denied November 12, 1975.*

Brody & Gore, of Chicago (John M. Mack, of counsel), for appellant.

Howard & French, of Chicago (Richard G. French and Stuart N. Litwin, of counsel), for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This litigation was begun by a truck driver who sued two oil companies for personal injuries he sustained at an oil refinery owned by one of them. The case was heard by a jury that returned a verdict in favor of the truck driver. After hearing a post-trial motion, the court ordered that judgment notwithstanding the verdict be entered in favor of the oil company which was then the only defendant in the case. Alternatively and conditionally, it denied the company's motion for a new trial. The issue in this appeal is whether the trial court erred in entering judgment notwithstanding the verdict.

## I.

For about 18 months prior to June 6, 1967, James Reynolds was a truck driver for Jones and Cleary Roofing Company of Chicago. His job required him to go at least once a day to a refinery owned by the American Oil Company in Whiting, Indiana and there obtain a tank truck load of asphalt or pitch. Sometime near 6 p.m., in the evening of June 6, Reynolds went to the refinery to get a load of hot asphalt. He entered a yard where his truck was weighed; a receipt was given him for his order, he went to a shed where refinery employees waited for assignments, and then Reynolds proceeded to a loading rack to which he was assigned to load his truck. The two refinery employees went to activate the asphalt pump that was used in the loading process.

Reynolds had been in the refinery yard on many occasions before. He knew the tank truck loading procedure because he had been shown it by American Oil employees. At the time, there was in existence a series of instructions given by American Oil to its employees concerning the loading of tank trucks at its refinery. In these instructions, American Oil had mandated that nonemployee truck drivers were not to use any of its refinery equipment. The spout that was used in loading asphalt into tank

trucks was an apparatus the company told its employees was not to be used by any nonemployee truck driver. Reynolds, however, was not told of these instructions or the prohibition they contained; he was never shown a copy; there were no signs at or near the loading place telling him he was prohibited from using company equipment or that there was any danger in the tank truck loading procedure.

On the day in question, Reynolds went to set up his truck, being told to do so by the refinery employees who went out to start the pumps. So, as he had done some 900 times before, he began the loading procedure. This required him to go to a loading dock, climb to the top of the truck, lower a ramp over the truck's cylindrical tank, and pull the swing arm of a spout from which hot asphalt could flow into the tank's aperture. When, on this occasion, Reynolds reached the top of the truck, he opened the hatch and then walked to the swing-loading arm that was resting against the loading dock. He took hold of the handle with his right hand; and with his left, seized a cable attached to it. This was the procedure Reynolds had been shown by refinery employees. When, this time, he touched the swing arm, it moved from the dock, but with some difficulty. Reynolds knew that the attached cable was a counterweight device used to pull the arm back to the dock after the loading process was completed. As he pulled the swing arm, the cable in his left hand either broke or gave way, causing him to fall to the driveway below. He was injured and was taken later to a nearby hospital for treatment. As a result, he incurred a total of $3,742 in medical expenses.

## II.

To recover for his injuries and the damages he suffered, Reynolds filed a one-count complaint against American Oil and another company, Standard Oil of Indiana. He alleged that the two companies owned the refinery in question; that he sustained serious injuries there when, while loading his asphalt tank truck, the handle of a loading pipe broke loose without warning and caused him to fall a great distance to the ground.

The companies filed a joint answer in which American Oil admitted owning the refinery, but Standard denied it had any interest in the place where the accident occurred. Then, the case went to trial before a jury; and after Reynolds had presented his evidence and rested, he asked leave to amend his complaint. Neither defendant objected. An amended complaint, containing two counts, was filed. Count I repeated the original allegations with additional ones concerning the loading pipe which Reynolds claimed had caused his injuries when it either broke or pulled loose without warning. Count II alleged the factual occurrence described in Count I; but in addition, it charged six acts of negligence which Reynolds

attributed to the two companies. He claimed that (1) on the day in question, they failed to provide proper personnel to load his truck; (2) they failed to provide proper personnel to supervise and/or warn him of the dangers involved in setting up or loading his truck; (3) they failed to provide any sign or other means of advising him of the proper way of setting up or going about the tank truck loading procedure; (4) they provided a faulty counterbalance cable on the handle to the loading pipe knowing, or they should have known, that the cable might be used to move the pipe; (5) they provided a faulty counterbalance cable on the loading pipe which they knew, or should have known, would slacken or pull loose if pulled on to move the loading pipe; (6) they failed to provide any warning concerning the danger of pulling on the counterbalance cable or moving the loading pipe.

Neither company answered the amended complaint. However, both moved for a directed verdict. The court allowed the motion as to Standard but denied it as to American Oil. Thereafter, as the only remaining defendant, American Oil put on its defense. At the close of all the evidence, it made a motion for a directed verdict. The trial court denied the motion. Then, the cause was argued, the jury was instructed, and after deliberating, it returned a verdict of $50,000 in Reynolds' favor. Within the time allowed by law, American Oil filed a post-trial motion which, among other relief, prayed for a judgment notwithstanding verdict. The trial court heard the parties and then ordered that judgment be entered in favor of American Oil notwithstanding the verdict that had been returned in Reynolds' favor. Alternatively and conditionally, it denied a new trial.

### III.

■■■ In determining whether the trial court erred in entering judgment for American Oil notwithstanding the verdict, we must look at the evidence on which the jury deliberated and returned its verdict. The motion which the trial court granted, or one for a directed verdict, presents the same kind of issue; they are governed by the same rules of law. (*Yates v. Cummings*, 4 Ill.App.3d 899, 282 N.E.2d 261.) In each instance, the determination to be made is whether all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict, based on that evidence, can ever stand. (*Darda v. Chicago Transit Authority*, 100 Ill.App.2d 94, 241 N.E.2d 478.) It is now settled law in this state that verdicts ought to be directed and judgment notwithstanding the verdict entered only in those cases in which the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary

verdict based on such evidence can ever stand. (*Pedersen v. Kinsley*, 25 Ill.App.3d 567, 323 N.E.2d 562; *Homka v. Chicago Transit Authority*, 2 Ill.App.3d 334, 276 N.E.2d 351.) Therefore, where the evidence shows a substantial factual dispute, or where assessment of witness credibility and election between conflicting evidence may be decisive, it is error to direct a verdict or enter judgment notwithstanding the verdict. *Lovejoy v. National Food Stores, Inc.*, 12 Ill.App.3d 982, 299 N.E.2d 816.

In this case, when the jury deliberated. it had before it Reynolds' testimony in which he described how he went to the American Oil refinery in Whiting, Indiana, on June 6, 1967, to load his truck with asphalt; how, as he had done before, he went to the top of his truck where he employed the loading procedure he had been shown by refinery employees. He explained to the jury how he stepped from the loading dock to the top of his truck, took hold of a cable and a handle on the pipe; and that the cable attached to the pipe which he was to use in the loading process either became loose or broke causing him to fall to the ground and suffer his injuries. Three witnesses for Reynolds testified concerning the medical treatment that was given him for his injuries. A 31-year employee of the refinery, called as an adverse witness, testified that at the time of the incident in question, he was the shift foreman in the asphalt area where the accident happened. This witness knew the loading operation for tank trucks at the refinery. He told the jury about the counterbalance cable to which Reynolds had referred in his testimony and that if the cable were held by a person "* * * you would have a bunch of free cable and all of a sudden it will snap back and that will hit you in the face." He emphasized to the jury the danger that existed in the use of the counterbalance cable; and referring to the air pressure system used to clear out the loading arm and spout, said that if it were not properly regulated, the force "* * * could blow your head off * * *." He told the jury that the swing arm could break loose of its fastening and rise "* * * straight up * * * and if [a person were above it, he] would get a ride into orbit."

In addition, Reynolds called two fellow workers who had also driven their trucks to the refinery. They told the jury that American Oil employees had shown them how to set up their trucks for loading, had told them to proceed with loading operations, and they had done so. They testified that they had never been given safety instructions, nor had they ever been warned either by American Oil or any of its employees that there was any danger in handling the counterbalance cable or the loading pipe about which Reynolds had testified. To supplement Reynolds' testimony, and that of the witnesses he had called, the jury had before it 30 exhibits which, on Reynolds' behalf, the court had received in evi-

dence. These were, mainly, photographs of the loading rack at the American Oil Refinery where Reynolds had driven his truck, from which he had fallen when he was injured.

From American Oil, the jury heard three witnesses. The first was a doctor who, for the defense, reviewed the evidence of Reynolds' injuries. The second was a company investigator who talked with Reynolds at the hospital where he was taken after he was injured. The third was an American Oil safety supervisor who visited Reynolds in the hospital. This witness told the jury that in a conversation the day after the accident, Reynolds told him that the counterbalance cable had broken, causing him to fall. In the course of presenting these witnesses, American Oil offered and had received in evidence 37 exhibits consisting mainly of photographs of the accident scene including details showing the counterbalance cable and the loading area involved in the accident. The investigator and the safety supervisor told the jury that American Oil's instructions prohibited a nonemployee truck driver from using the equipment it had at its refinery. Both witnesses insisted that in their experience, neither had ever known of anyone relating these instructions. In support of this testimony, a copy of the instructions was admitted in evidence. To close its proof, counsel for American Oil read to the jury the allegations in Reynolds' original and amended complaint concerning the breaking of the cable. In substance, this was the evidence on which the jury returned its verdict in favor of Reynolds.

In resolving the issue before us, we observe that the amended complaint that Reynolds filed expanded the underlying theory of his cause of action. More importantly, the issues instruction which the court gave over objections told the jury that Reynolds was claiming he was injured, while in the exercise of ordinary care for his safety, because the defendant oil company was negligent in one or more of the following respects: "that on June 6, 1967, on the company's premises, a cable attached to a loading pipe broke while he was trying to load his asphalt tank truck; that the cable loosened or pulled away; that he was not given any warning or instruction in the use or non-use of the cable attached to the loading pipe." Before being so instructed, the jury heard the arguments of the parties.

. Counsel for Reynolds argued that American Oil had maintained a dangerous place to which he was invited to park his tank truck for loading; that although he had been instructed by refinery employees to load his truck by the procedure they described to him, neither the refinery nor its employees warned him or furnished him any information concerning the dangers inherent in the loading procedure that involved use of the counterbalance cable and loading pipe.

· Counsel for American Oil argued that Reynolds had claimed in the allegations of his original complaint, in his testimony at a deposition, and in his testimony at trial, that the counterbalance cable broke causing him to fall; that the exhibits it had introduced in evidence showed that the counterbalance cable had not broken; that Reynolds, in fact, was a volunteer who, contrary to the rules of the refinery, had participated in a loading procedure from which he had been prohibited; and that as a consequence, he was injured by his own negligence.

It appears, then, that from the evidence, the arguments of the parties and instructions it had received, the jury was asked to decide whether it was true, as Reynolds had claimed, that on June 6, 1967, at the refinery in question, he was injured by the negligence of American Oil Company when a counterbalance cable broke, came loose or gave way; or because the company allowed a dangerous condition to exist on premises to which he had been invited as an employee of a company that regularly purchased asphalt from the refinery.

■■ The workman of a buyer who is sent to a seller's premises to remove what is sold is the business invitee of the seller who had a duty to keep his premises reasonably safe for the workman and to warn the workman of any failure to keep the premises safe; and the workman is entitled to rely on the seller's performance of such duty. (*Pauckner v. Wakem*, 231 Ill. 276, 83 N.E. 202; see *Kulka v. Nemirovsky* (1934), 314 Pa. 134, 170 A. 261.) This principle of tort law has wide recognition. For example, the restatement of the law of torts comments that "[b]usiness visitors * * * [include] those who come upon land not open to the public, for a purpose connected with business which the possessor conducts upon the land, or for a purpose connected with their own business which is connected with any purpose, business or otherwise, for which the possessor uses the land. Thus a truck driver from a provision store who enters to deliver goods to a private residence is a business visitor * * *." Restatement (Second) Torts § 332, Comment e (1965); see Annot., 32 A.L.R. 3d 9 (1970); compare *Tompkins v. Twin Oaks Dairy, Inc.*, 91 Ill.App.2d 88, 234 N.E.2d 403.

■■ In any event, whether Reynolds at the time he was injured was using ordinary care for his safety; whether he knew that American Oil had issued instructions which prohibited nonemployee truck drivers from using refinery equipment; whether the premises made available to him for the loading of his truck were safe and kept that way by the refinery were, questions of fact for the jury. See *Griffen v. Schubert Coal Co.*, 309 Ill.App. 439, 33 N.E.2d 178 (abstract opinion); *Jones v. Granite City Steel Co.*, 104 Ill.App.2d 379, 244 N.E.2d 427; see *Standard Oil Co. v. Hagan* (1949), 309 Ky. 767, 218 S.W. 2d 969.

■■ Similarly, whether Reynolds was injured because a counterbalance cable he attempted to use broke, pulled loose or gave way, were questions for the jury. As to the underlying facts, Reynold's testimony concerning the events that led to his injuries on June 6, 1967, was, to a large extent, not contradicted. Indeed, the record shows a substantial factual dispute concerning the use of refinery equipment by nonemployee truck drivers, despite the instructions that American Oil had given its employees. Necessarily, this dispute required an assessment of witness credibility and an election by the jury of conflicting versions on the evidence. There was evidence from which the jury could have found that the injuries Reynolds sustained at the refinery owned by American Oil were caused by the company's negligence when a counterbalance cable he used broke, pulled loose or gave way. The exhibits before the jury gave conflicting views on whether this cable broke or gave way. On Reynolds' other theory of the case, there was evidence from which the jury could have found that his injuries were caused by conditions which American Oil maintained at its refinery that were unsafe and dangerous to those business invitees it attracted to its premises. On either theory, a verdict for Reynolds would have been proper. Therefore, it could not be said that all of the evidence in the record, when viewed in its aspects most favorable to Reynolds, so overwhelmingly favored American Oil that no contrary verdict could ever stand. (See *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504; compare *Neubauer v. Coca Cola Bottling Company of Chicago*, 96 Ill.App.2d 18, 238 N.E.2d 437.) For this reason, the trial court erred when it granted American Oil's motion for judgment notwithstanding the verdict. See *Weiner v. Trasatti*, 19 Ill.App.3d 240, 311 N.E.2d 313; compare *Dammann v. Turner Cartage and Storage Co.*, 48 Ill. App.2d 65, 198 N.E.2d 352.

## IV.

In our judgment, the trial court should have denied the post-trial motion filed by American Oil, in its entirety. Accordingly, the judgment notwithstanding the verdict is reversed and the cause is remanded with directions that the trial court overrule the post-trial motion and enter judgment for Reynolds on the verdict of the jury.

Reversed and remanded with directions.

DOWNING, P. J., and STAMOS, J., concur.