ILONA HIRN, Plaintiff-Appellant, *v.* EDGEWATER HOSPITAL *et al.*, Defendants-Appellees.

First District (1st Division)    No. 78-976

Opinion filed July 21, 1980.

John G. Phillips, of Chicago, for appellant.

Victor J. Piekarski and Joseph A. Norton, both of Querrey, Harrow, Gulanick & Kennedy, of Chicago, for appellee Edgewater Hospital.

William V. Johnson and Thomas H. Fegan, both of Johnson, Cusack & Bell, of Chicago, for appellee Forough Parsa, M.D.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

The plaintiff, Ilona Hirn, filed a medical malpractice action against Edgewater Hospital (hereinafter hospital) and Dr. Forough Parsa for injuries incurred as the result of a renal arteriography[1] performed by Dr. Parsa at defendant hospital. After the jury returned verdicts for both defendants and the trial court denied her post-trial motions for a judgment notwithstanding the verdict and a new trial, the plaintiff filed the present appeal. The following errors are urged on appeal: (1) the trial court erred in failing to direct a verdict for the plaintiff against the hospital; (2) the trial court erred in failing to direct a verdict for the plaintiff against Dr. Parsa; (3) the scope of expert testimony permitted in medical malpractice cases deprived the plaintiff of her right to a trial by jury; (4) numerous evidentiary errors required a new trial of this cause; and (5) conduct of Dr. Parsa's counsel was so prejudicial that it denied plaintiff a fair trial.

We affirm.

While the plaintiff's complaint, filed February 19, 1974, alleges a number of negligent acts or omissions against each defendant, the ultimate issues in the trial are best gleaned from the issue instruction submitted to the jury. There it is alleged that the hospital was negligent in that:

> "One of the Hospital nurses only applied pressure at the puncture site for two minutes instead of the five minutes required by accepted practice.

---

[1] The record refers to the instant procedure as a renal arteriography, renal arteriograph, and a renal angiography. For the sake of continuity, we will uniformly refer to this procedure as a renal arteriography. Stedman's Medical Dictionary 120 (23d ed. 1976); D.J. Tennenhouse, Attorneys Medical Deskbook §133, at 261-62 (1975).

Acting through its staff, the Hospital failed to check for ankle pulses, foot color and circulation to the foot."

Dr. Parsa was negligent, it was alleged, in that:

"She failed to place written follow-up orders in the chart to direct the nursing staff. She failed to personally perform an adequate follow-up of the Plaintiff.

She failed to take adequate steps to relieve Plaintiff's condition, or secure the consultation of a physician competent to do so, after she was informed of Plaintiff's condition by Dr. Dimitrov.

She attempted to insert the needle before first making certain of the location of the femoral artery, thereby striking the femoral nerve with the needle.

She failed to perform a cutdown procedure or insert the catheter into the artery in the arm when she was unable to locate the femoral artery.

She failed to note in hte [sic] charts that the vein as well as the femoral artery had been punctured with the needle.

She failed to demonstrate skill in the manner in which she performed the arteriogram.

She failed to require or oversee the application of pressure at the puncture site for a longer period than the ususal [sic] five minutes when she knew the Plaintiff had a propensity towards high blood pressure."

The plaintiff was hospitalized by Dr. Dimitrov, her family physician, to determine the cause of her high blood pressure, recurrent chest pain, and frequent headaches. A renal arteriography was ordered to determine whether there was an abnormality of the renal arteries or kidney system. This procedure was performed at Dr. Dimitrov's request, on December 21, 1973, by Dr. Parsa with the assistance of four hospital employees. A renal arteriography is performed by injecting a radio opaque dye into the femoral artery located in the groin and then taking an X ray of the renal arteries. An initial step in the procedure is the insertion of a needle into the femoral artery. In this case, that step was complicated by the plaintiff's obesity. The plaintiff was informed by Dr. Parsa, prior to surgery, that she might have to perform a "cut down" procedure on plaintiff because of her weight. Dr. Parsa testified that she encountered difficulty locating the femoral artery and that she made two or three attempts before hitting it. The procedure, however, was completed without further complication.

The evening of the day that the procedure was performed, the plaintiff experienced femoral bleeding and swelling and observed a hematoma[2] in her right upper thigh. Dr. Parsa followed the plaintiff's

---

[2] A hematoma is a localized mass of blood which has exuded from a blood vessel into the surrounding tissue. See Stedman's Medical Dictionary 625 (23d ed. 1976).

condition for 24 hours after the renal arteriography finding nothing unusual in the plaintiff's condition during this period of time. Two days after the procedure was performed, the plaintiff reported having a "pins and needles" sensation. By December 27, the day before she was discharged, the hematoma had grown to a size 20 by 30 centimeters (approximately 9 by 13 inches). On January 8, 1974, the plaintiff was rehospitalized suffering chest pains, difficulty in breathing, weakness, profuse perspiration, and continuing leg pains. Tests disclosed blood clots in her lungs. During her hospitalization the plaintiff also experienced loss of her right knee reflex and paralysis of her quadriceps muscle. Both problems were found to be the result of damage to the femoral nerve.

At the trial the following testimony was received regarding the cause of the plaintiff's nerve injury and embolism.[3] Dr. Neil Allen, a neurologist who treated the plaintiff in consultation after the procedure, testified that the plaintiff's nerve injury was caused either by pressure from the hematoma or by a direct puncture of the femoral nerve during the renal arteriography. Dr. Parsa testified that, while she was not a neurologist, she concluded that the hematoma was the most likely cause of the nerve injury. She also testified, however, that it is not unusual to have a hematoma form after a renal arteriography. This conclusion was confirmed by Drs. Dimitrov and Blazek, although the latter noted that he had never seen a hematoma of such great size. Furthermore, Dr. Baker, the plaintiff's expert, testified that the visible size of a hematoma has no bearing on whether pressure is being exerted on a nerve.

When asked whether the plaintiff's embolism was a result of the renal arteriography, Dr. Baker initially stated that he would rather not hazard a guess at what caused the plaintiff's embolism. Subsequently, however, he stated that he had an opinion, but not a firm one, that the pulmonary embolism could have resulted from the renal arteriography. He explained that the near proximity of any operation to the existence of an embolism would give him that opinion. On cross-examination, he clarified his testimony by stating that he did not say that the embolism was caused by the renal arteriography, but only that it could have been related to it. He explained that there are numerous causes of emboli. Dr. Blazek also testified that the plaintiff's embolism could be related to the arteriography. Dr. Dimitrov never formed an opinion as to the cause of the embolism.

Drs. Parsa, Blazek, and Baker testified concerning the standard of care relevant in this cause and whether that standard had been breached. Dr. Baker, the plaintiff's expert, testified that a physician who could not locate the femoral artery due to the obesity of a patient or some other complication had two alternative techniques to utilize. The physician

---

[3] An embolism is an obstruction of a blood vessel by a foreign substance or a blood clot. See Stedman's Medical Dictionary 451 (23d ed. 1976).

could use a "cutdown" method where an incision is made to clearly expose the artery or, in the alternative, the brachial artery in the arm could be used because it is easier to locate. He noted that, at his institution, it is standard procedure to stop this type of procedure after two unsuccessful attempts to locate the artery. He also testified that, subsequent to the procedure, 10 to 20 minutes of pressure should be applied to the artery for patients with normal blood pressure and as much as 20 to 30 minutes for patients, such as the plaintiff, who suffer from high blood pressure. Dr. Baker, however, stated that it would not be a violation of the prevailing standard of care either to hit the vein two or three times or to use the femoral artery as a site when encountering difficulty hitting the femoral artery. He did outline three post-operative deviations from the standard of care: (1) no post-operative orders were given to the nursing staff to alert them of possible post-operative complications; (2) some medical action should have been taken when pain persisted for 48 hours; and (3) the patient should not have been released with a hematoma the size of the plaintiff's. Dr. Baker would not offer an opinion, however, concerning whether these deviations from the standard of care constituted a breach of Dr. Parsa's duty to the plaintiff because he was not familiar with Dr. Dimitrov's experience and did not know what his agreement was with Dr. Parsa as to post-operative care. He found no other deviations from the required standard of care.

Dr. Blazek, Dr. Parsa's expert and a specialist in cardiology, testified that, to locate a femoral artery in performing a renal arteriography, a physician should palpate the arterial pulse to act as a guideline to insertion of the needle. It is not necessary to call in a consultant when having difficulty finding the artery. After the procedure is performed, pressure should be applied to the blood vessel for five minutes and then an additional five more minutes if bleeding persists. In most instances, hemostasis[4] is achieved after the first five to 10 minutes. Because of the close proximity of the femoral artery and vein, Dr. Blazek would not consider it a deviation from the standard of care for a cardiologist performing a renal arteriography to hit the vein two or three times. If the vein is punctured slight pressure on it causes hemostasis. It is not necessary to call in a consultant if the vein is hit. Dr. Blazek also testified that if pressure was not properly applied this would be signaled by bleeding from the puncture site or visible swelling. He concluded, however, that if external bleeding was not observed for seven hours after the procedure was completed, as in this cause, this would indicate that compression was properly applied. He also stated that the follow-up

---

[4] Hemostasis refers to the arrest of bleeding. See Stedman's Medical Dictionary 635 (23d ed. 1976).

procedure by a cardiologist performing an arteriography depends on the agreement between the cardiologist and the treating physician.

Dr. Parsa also testified as to the prevailing standard of care required of physicians in Cook County for the instant procedure in 1973. She explained that the proper procedure in locating the femoral artery is to extend the thigh and palpate the blood vessel. The artery is distinguished from the vein because the blood from it is red rather than blue. If a vein is hit before the artery is found, the procedure is not stopped but rather pressure is applied for a minute or two to the vein and then another attempt to hit the artery is made. After completing the procedure, pressure should be applied for between five to 10 minutes depending upon the individual patient. She concluded that her performance complied with the foregoing standards. She remembered experiencing some difficulty in hitting the artery but did not remember exactly how many attempts she made before finally hitting the artery. She thought she had hit it on the second or third attempt. The hospital report made no note of this or any other specific detail of the procedure, she testified, because these details were very routine. She did not consult anyone after experiencing trouble hitting the artery because that was not necessary. She also stated that it would have been wrong to do a "cutdown" because they are only done in the brachial artery. While she did not remember how long pressure was applied in the instant case, or how long she stayed in the room after the procedure was completed, she did know that pressure was applied until hemostasis was achieved. She stated that customarily pressure was applied for five to 10 minutes by a nurse. She would stay in the room until hemostasis was achieved, leaving only when the patient left. Dr. Parsa also testified that the customary follow-up time for a cardiologist after an arteriography is 12 to 24 hours. In this case she followed up the plaintiff's condition for approximately 24 hours, in which time the plaintiff encountered no unusual complications. Dr. Dimitrov did consult with her concerning the size of the hematoma.

Carol Crayne, a registered nurse formerly employed by the defendant hospital, testified on behalf of the plaintiff that she was present in the operating room as an observer. She stated that Dr. Parsa made five or six attempts to hit the artery. During one of these attempts, the plaintiff cried out in pain and was given a pain killer intravenously, a fact confirmed by the plaintiff in her testimony. Crayne concluded that the femoral nerve was hit at this time. She also testified that pressure was only applied for two minutes after the procedure was completed and that Dr. Parsa left the room prior to the nurse having completed applying pressure. Crayne testified that the nurse only applied pressure for two minutes because he wanted to go to lunch. It was approximately noon when the procedure was completed.

After the close of all of the evidence, the plaintiff moved for a directed verdict which was denied. After the verdict for the defendants, the plaintiff filed a motion for judgment notwithstanding the verdict. This motion and the plaintiff's motion for a new trial were denied on March 14, 1978. The present appeal is taken from the judgment on the verdict entered on October 4, 1977, and the denial of the post-trial motions. Timely notice of appeal was filed.

We turn first to the plaintiff's argument that the trial court should have granted her motion for a directed verdict or in the alternative a judgment notwithstanding the verdict against the defendant hospital. Under the *Pedrick* rule (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), a directed verdict or a judgment notwithstanding the verdict should only be entered when the evidence, viewed in a light most favorable to the opponent, "so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510.) The plaintiff argues that, when a plaintiff establishes a prima facie case, the burden of producing evidence shifts to the defendant. (*Heiser v. Chastain* (1972), 6 Ill. App. 3d 552, 285 N.E.2d 601.) Plaintiff argues that, consequently, when the hospital failed to proffer any evidence after she presented a prima facie case, she was entitled to a directed verdict as a matter of law. The plaintiff has failed to present any case law in support of this argument, and our research has disclosed that this argument has repeatedly been rejected by Illinois courts. (*Athey v. City of Peru* (1974), 22 Ill. App. 3d 363, 317 N.E.2d 294; *Maynard v. Irving Davis Co.* (1970), 122 Ill. App. 2d 28, 257 N.E.2d 604; *Galarza v. Melter* (1969), 116 Ill. App. 2d 173, 253 N.E.2d 469; *Kordik v. Kenar* (1969), 112 Ill. App. 2d 371, 251 N.E.2d 380.) In *Athey,* the court explained:

"The rule for directing verdicts does not require that verdicts be directed merely because a defendant has failed to introduce evidence in his own behalf or has failed to dispute facts presented by the plaintiff. Facts may be undisputed or a defendant may have failed to introduce evidence, but it does not follow that issues are therefore uncontroverted. Undisputed facts may give rise to different reasonable inferences." 22 Ill. App. 3d 363, 370.

In the instant case, the plaintiff argues that sufficient evidence was presented to establish a prima facie case that the nerve injury she suffered was the result of the hematoma which was caused by the failure of the hospital's employees to properly apply pressure to the plaintiff's artery at the conclusion of the procedure. From our review of the evidence, we conclude that the facts were not uncontroverted on these issues. Carol Crayne's testimony, that pressure was applied for only two minutes, is directly contradicted by Dr. Parsa's testimony that pressure was applied in the instant case until hemostasis was achieved and that the minimum

period of time in which hemostasis is achieved is five minutes. Notably, Crayne did not testify that the plaintiff was still bleeding at the time that pressure was discontinued. Moreover, Dr. Blazek testified that, in his opinion, the compression procedure must have been properly followed because the plaintiff's bleeding, subsequent to the procedure, did not start until approximately seven hours after the completion of the renal arteriography. Thus there was adequate evidence from which the jury could have concluded that the hospital's employees properly applied pressure incident to the procedure.

■■ As to the issue of causation, Drs. Dimitrov, Blazek, and Parsa all agreed that a hematoma was not unusual after this type of procedure. Additionally, Dr. Baker, the plaintiff's expert, noted that the visible size of the hematoma has no bearing on whether pressure is being exerted on a nerve. Moreover, while Dr. Parsa concluded that the hematoma was the most likely cause of the nerve damage, Dr. Allen testified that the nerve injury could have been caused by a direct puncture of the femoral nerve. Indeed, Carol Crayne testified that the nerve was hit during the procedure as evidenced by the plaintiff experiencing a pain in her leg during the procedure. From these facts, the jury could have concluded that the hematoma was not the proximate cause of the plaintiff's injuries. As a directed verdict or judgment notwithstanding the verdict is properly denied where controverted issues of facts must be decided by the jury as fact-finder (*Anderson v. General Grinding Wheel Corp.* (1979), 74 Ill. App. 3d 270, 393 N.E.2d 9; *Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 337 N.E.2d 403; *Johnston v. Basic* (1973), 16 Ill. App. 3d 453, 306 N.E.2d 610), the instant cause was properly submitted to the jury and its verdict is supported by the evidence. Therefore, we find that the trial court properly denied the plaintiff's motions for a directed verdict and judgment notwithstanding the verdict.

We turn next to the plaintiff's argument that the trial court should have directed a verdict against Dr. Parsa. In support of this argument, the plaintiff argues that expert witnesses for both sides gave overwhelming testimony that Dr. Parsa was negligent in persisting in her attempt to insert the needle in the plaintiff's artery after encountering difficulty and in failing to assure that proper compression was applied after the renal arteriography was completed. We reject the plaintiff's characterization of the expert testimony as overwhelmingly establishing Dr. Parsa's negligence. The plaintiff places primary reliance upon the testimony of Dr. Baker. She alleges that he testified that the standard of care applicable in a renal arteriography was to desist after making two attempts to hit the femoral artery. In order to establish the prevailing standard of care, it is necessary to establish that degree of knowledge, skill and care which a good physician or surgeon in the same or similar community or hospital

would bring to a similar case under like circumstances. *Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 303 N.E.2d 146, *aff'd* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Kwak v. St. Anthony De Padua Hospital* (1977), 54 Ill. App. 3d 719, 369 N.E.2d 1346.

■■ Upon review of Dr. Baker's testimony, we find that he failed to establish the applicable standard of care because his testimony did not pertain to the accepted or customary medical standards at that time or place, but rather only to the standard followed by his medical institution. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *Borowski v. Von Solbrig*; *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53; *Kwak v. St. Anthony De Padua Hospital.*) As stated in *Walski*:

> "It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care." (72 Ill. 2d 249, 261.)

We should also note that, while Dr. Baker stated that he would desist after two attempts at hitting the femoral artery and would utilize either a "cut down" procedure or resort to use of the brachial artery, he specifically denied that Dr. Parsa breached the prevailing standard of care. Accordingly, even if his testimony could be characterized as establishing the standard of care, his testimony was clear that there was no breach by Dr. Parsa. Drs. Parsa and Blazek also testified that there was no necessity to halt the arteriography procedure once some difficulty was encountered in hitting the artery. Thus we find that the trial court properly refused to direct a verdict in the plaintiff's favor or enter a judgment notwithstanding the verdict on this issue in that the jury's verdict was consistent with the evidence.

Nor do we find that a directed verdict or judgment notwithstanding the verdict would have been proper as to the alleged negligent supervision by Dr. Parsa of the application of pressure to the plaintiff by the hospital employee. The testimony of the experts as to the standard in applying pressure subsequent to an arteriography varied as to the amount of time which is necessary for pressure to be given. According to Drs. Blazek and Parsa, pressure should be given from five to 10 minutes, while Dr. Baker stated that 10 to 20 minutes was appropriate for a normal patient and 20 to 30 minutes for a patient with high blood pressure. Both Dr. Parsa and Dr. Blazek noted that the exact amount of pressure depended upon the particular patient.

Nurse Crayne testified that only two minutes of pressure was applied. Dr. Parsa, however, testified that, while she could not remember

the exact number of minutes of pressure which were applied, she did know that hemostasis was achieved and that she did not leave until it was achieved and the patient was returned to her room. Notably, Crayne did not testify that hemostasis had not been achieved. From this testimony the jury could have concluded that the amount of pressure necessary to achieve hemostasis was applied. Accordingly, we find no error in the trial court's denial of the plaintiff's motion for directed verdict or judgment notwithstanding the verdict.

■■ The plaintiff urges, however, that the testimony of Dr. Parsa as to the procedure she followed in the instant surgery was erroneously received in that it was based on her custom and habit rather than what actually transpired in the instant procedure. (*Vuletich v. Bolgla* (1980), 85 Ill. App. 3d 810, 407 N.E.2d 566; *Bevelheimer v. Gierach* (1975), 33 Ill. App. 3d 988, 339 N.E.2d 299.) Our review of the record reveals that the references as to custom in Dr. Parsa's testimony were elicited during the plaintiff's section 60 examination of Dr. Parsa (Ill. Rev. Stat. 1977, ch. 110, par. 60) and that plaintiff's counsel made no objection to any of these references in the trial court. As it is a well established rule of appellate review that a court of review will not consider any question not raised below, we find that the plaintiff has waived this issue and, therefore, we must decline to reach it. *H. J. Tobler Trucking Co. v. Industrial Com.* (1967), 37 Ill. 2d 341, 226 N.E.2d 601; *Hayes v. Preferred Risk Mutual Insurance Co.* (1978), 66 Ill. App. 3d 112, 383 N.E.2d 669; *McKinnon v. Yellow Cab Co.* (1975), 31 Ill. App. 3d 316, 333 N.E.2d 659.

The plaintiff's next argument is a challenge to the use of expert testimony in medical malpractice cases. This argument centers upon plaintiff's contention that experts should not be allowed to testify as to the standard of care which exists in a particular cause because duty is a question of law to be determined by the trial court. Additionally, it is argued that the function of the jury is usurped where an expert is allowed to testify as to the ultimate issue in the case, the negligence of the defendant. The plaintiff also urges that a number of defenses utilized in malpractice cases are improper. A number of jury instructions are also presented to this court to remedy some of the alleged ills in this area of law. On a procedural note we find that, while the plaintiff has pointed out specific references in the record where objections were made to the use of an expert to develop the standard of care, no similar references have been supplied which reveal that the plaintiff similarly objected to the use of medical experts to establish a breach of that standard. Nor does it appear that the proposed jury instructions were ever given or that the number of defenses attacked by the plaintiff as erroneous were either present in this cause or objected to at trial. Accordingly, these issues are not now before us on appeal.

We should note, however, that even were we to find that any or all of these issues were properly raised below, it is unnecessary for this court to address these issues at this time. The use of experts in medical malpractice actions to establish the standard of care and any breach of that standard is well established in Illinois. (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 278; *Borowski v. Vol Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 392 N.E.2d 203; *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53.) Moreover, this court recently rejected the identical contention raised by plaintiff here in *Chiero v. Chicago Osteopathic Hospital*. From the foregoing it is clear that any change in the role of experts in medical malpractice actions should be made by the supreme court and not this court.

The plaintiff next urges that various evidentiary errors warrant a new trial. We do not agree. The plaintiff's first asserted error is that she was prejudiced by the admission of the testimony of Sister Ruth Eckrich and Dr. Blazek offered as impeachment of the plaintiff's surprise witness, Carol Crayne, because it was totally irrelevant to any of the issues in the case and constituted hearsay. In response, the defendants contend that Sister Eckrich's testimony was properly admitted as impeachment to attack Crayne's credibility, not as hearsay or to challenge plaintiff's right to bring a lawsuit. Crayne testified on cross-examination that she and the plaintiff first discussed the lawsuit on the Friday before trial. She further testified that she had not told anyone that she was present at the procedure and was aware of how it was performed until Wednesday of the week of the trial. Furthermore, although she worked with the plaintiff after her second hospital stay for several months, she stated that the plaintiff had not told her that she filed this lawsuit shortly after her second discharge. Rather, she testified that she learned of the suit later from someone at the hospital. Sister Eckrich testified that she shared a room with the plaintiff during the plaintiff's second hospital stay. She stated that during this time the plaintiff and Nurse Crayne had a number of discussions about the plaintiff filing a lawsuit. Dr. Blazek testified that he saw Carol Crayne on the day that opening statements were made and that she advised him that she was going to testify that she saw Dr. Parsa use the needle five times in attempting to hit the artery and that the compression procedure was improper. This appears to be prior to the time Crayne testified that she informed plaintiff and her counsel that she had been present at the procedure.

■■ While a trial judge in his discretion may permit inquiry on cross-examination about any previous statements inconsistent with assertions which the witness had testified to on direct or cross-examination, a

witness may not be contradicted as to a collateral, irrelevant, or immaterial matter nor may extrinsic evidence be produced to contradict such matters. (*Ward v. Kamberos* (1976), 36 Ill. App. 3d 703, 344 N.E.2d 691; *Herget National Bank v. Johnson* (1974), 21 Ill. App. 3d 1024, 316 N.E.2d 191; *Ray v. Cock Robin, Inc.* (1973), 10 Ill. App. 3d 276, 293 N.E.2d 483.) Impeachment by extrinsic proof, however, is permissible if the facts are otherwise admissible because they are relevant to the issues in the cause or are facts which are admissible to discredit the witness as to interest, bias, motive, corruption, or the like. (*Herget National Bank*; McCormick, Evidence §36 (2d ed. 1972).) In the instant case we believe that the testimony of Sister Eckrich was independently admissible as evidence of bias although Crayne had briefly noted her friendship with the plaintiff during direct examination. (*Schmitt v. Chicago Transit Authority* (1962), 34 Ill. App. 2d 67, 179 N.E.2d 838; see generally McCormick, Evidence §36, at 70 (2d ed. 1972).) The defendants objected to the use of Crayne at the trial in that she had not been noted as an occurrence witness in the interrogatories nor had her presence been made known to the defendants at any time prior to trial. It was argued that Crayne was biased and in fact tried to promote the present litigation. The trial court, in allowing Crayne to testify, stated that any of the defendants' assertions about Crayne could be used to attack her credibility. It was for the jury to determine if such evidence affected Crayne's credibility. Moreover, even if the scope of the testimony of Dr. Blazek or Sister Eckrich exceeded that which was appropriate to show bias, it did not sufficiently prejudice the plaintiff to justify a reversal. Compare *Herget National Bank* and *Ward*.

■■ The plaintiff next asserts that she was prejudiced by references in the trial to certain prior medical conditions of the plaintiff which were not connected to the injuries in issue. We have examined the cases cited by the plaintiff in support of her argument and find that they are inapposite to the instant case. Here the allegedly erroneous references to the prior medical conditions of the plaintiff consisted of questions to Dr. Parsa and Dr. Baker concerning whether the existence of a certain medical condition could have caused the embolism. The trial court sustained plaintiff's objections to each question. Accordingly, any prejudice to the plaintiff was cured by the trial court's action.

■■ The plaintiff next argues that the defendant's counsel should not have asked the plaintiff to show her leg to the jury during the plaintiff's cross-examination because the plaintiff's injuries were internal injuries to the plaintiff's nerve and muscles and therefore could not be discerned on a visual examination. As this argument is raised for the first time on appeal, we decline to review the propriety of the trial court in allowing the demonstration.

■ Nor do we find it necessary to consider the plaintiff's argument that the trial judge abused his discretion in not allowing the photographs of the electromyogram tests, admitted into evidence in the trial, to go with the jury to the jury room. The plaintiff's brief makes no reference to the page reference in the record where the trial court was requested to allow the jury to take these photographs with them while they deliberated. Nor can we find any reference in the record to such a request. It is well established that the appellant must present a record which sufficiently allows the court on review to decide the issues and that in the absence of a complete record, this court will not disturb the trial court's finding. *Kankakee Concrete Products Corp. v. Mans* (1980), 81 Ill. App. 3d 53, 400 N.E.2d 637; *Nenadic v. Grant Hospital* (1979), 75 Ill. App. 3d 614, 394 N.E.2d 527.

The plaintiff's next argument must also be rejected. The plaintiff argues that the "defendant was permitted to 'qualify' her expert witness by questioning one of plaintiff's experts as to his reputation." A review of the record reveals that the pertinent expert witness, Dr. Cascino, was retained by the defendant Dr. Parsa to conduct certain neurological tests on the plaintiff. However, prior to calling Dr. Cascino as a witness in her case, the plaintiff called Dr. Cascino to testify as to the medical condition of plaintiff's leg. In the course of that testimony, the plaintiff asked Dr. Cascino various questions in an effort to qualify Dr. Cascino as an expert. Subsequent to testifying for the plaintiff, the trial court allowed Dr. Parsa to call Dr. Cascino in order to avoid having to have the doctor come in again during Dr. Parsa's case. As Dr. Cascino was qualified as an expert witness during the plaintiff's direct examination of him, it was obviously unnecessary for him to be requalified during Dr. Parsa's direct examination of him. The question to Dr. Allen, the plaintiff's neurologist, concerning Dr. Cascino's reputation was preliminary to a line of questioning whereas Dr. Cascino's opinions were made a part of the hypothetical presented to Dr. Allen. It was not error to determine whether Dr. Cascino's opinion altered Dr. Allen's views (*Stephens v. Inland Tugs Co.* (1976), 44 Ill. App. 3d 485, 358 N.E.2d 324; *Horwitz v. Michael Reese Hospital* (1970), 5 Ill. App. 3d 508, 284 N.E.2d 4), and we do not think that the preliminary question as to Dr. Cascino's reputation misled the jury into thinking that Dr. Cascino had skills which rendered his testimony more credible than any of the other medical experts. Therefore, we do not find that the trial court erred in failing to sustain the plaintiff's objections to this question.

■■ ■ The plaintiff's final argument involves various allegations of improper conduct by Dr. Parsa's counsel during trial.[5] We will briefly examine each of these allegations. First, the plaintiff urges that the

---

[5] Reference to defense counsel's conduct during this argument refers solely to Dr. Parsa's counsel, Mr. Johnson.

plaintiff was prejudiced by defense counsel's questioning of Carol Crayne as to her discussions with plaintiff's counsel concerning this suit. This line of questioning was improper, the plaintiff asserts, because it sought to imply both fabrication and that it was improper for the plaintiff to pursue a malpractice action. As earlier noted in this opinion, this testimony attacked the credibility of the witness and was therefore properly admitted by the trial court. The plaintiff next asserts that references to the plaintiff's financial resources were improper, citing *Jacobson v. National Dairy Products Corp.* (1961), 32 Ill. App. 2d 37, 176 N.E.2d 551. There the defense attorney stated in closing comment that plaintiff was "obviously a woman of some means" and was out to "take every last thing she can get away with * * *." (32 Ill. App. 2d 37, 44.) The *Jacobson* comments urged by the plaintiff as "virtually identical" to the comments alleged to be erroneous in the instant case are actually very dissimilar. The plaintiff testified on direct examination that after her surgery she was eventually forced to work part time because her condition was making it too hard for her to work full time. In light of this testimony and the plaintiff's claim for lost wages, defense counsel properly explored on cross-examination the extent to which plaintiff's injuries caused her to stop working and the extent to which the opening of a restaurant by the plaintiff and her husband contributed to her part-time schedule and ultimate termination.

■■ The plaintiff next argues that the defense counsel's final argument was "permeated with inaccuracies, innuendos, and inflammatory remarks, his repeated derogatory references to plaintiff's attorney and witnesses and his attempts to argue facts not in evidence * * *" and that these remarks require us to reverse. It is well settled in Illinois that it is in the sound discretion of the trial court to determine whether arguments of counsel are inflammatory. (*Fintak v. Catholic Bishop* (1977), 51 Ill. App. 3d 191, 366 N.E.2d 480; *Walters v. Taylor* (1976), 36 Ill. App. 3d 934, 344 N.E.2d 765.) Moreover, every reasonable presumption must be indulged that the court has performed its duty and properly exercised the discretion vested in it. (*Bise's Supermarket, Inc. v. Valley Forge Insurance Co.* (1977), 48 Ill. App. 3d 822, 363 N.E.2d 186; *Farmar v. Crane* (1975), 32 Ill. App. 3d 383, 336 N.E.2d 607.) The trial court, in determining whether remarks of counsel denied the other party a fair trial, may look at the conduct of the opposing counsel. (*Goldstein v. The Hertz Corp.* (1973), 16 Ill. App. 3d 89, 305 N.E.2d 617.) The trial court alone was aware of the conduct of counsel throughout this trial and the effect it had upon the jury. Upon reviewing the conduct of both counsel generally in this trial and in closing argument, we are not persuaded that the trial court erred in allowing defense counsel to proceed with his argument.

As to the plaintiff's last argument that she was prejudiced by the defendant's attempt to elicit testimony of inherent risks, we find no error.

The plaintiff infers that this line of questioning either directly or indirectly violated a motion in limine order. After reviewing the record, we agree with Dr. Parsa's view in her brief that although there was much discussion of this subject, it appears that the motion in limine was never passed upon. It is also clear from a review of the record that the court and defense counsel were in general agreement that a "bad result" is not indicative of negligence and, therefore, testimony could be received regarding usual complications of the procedure. A close reading of the objected line of questioning reveals that the trial court objected to the use of the term "risk" and did overrule some of the plaintiff's objections when defense counsel was able to word his questions to avoid this word. Thus we do not think that it can be concluded that defense counsel's continuation of this line of questioning was aimed at prejudicing the jury and achieving a result indirectly that he was prevented to achieve directly. Defense counsel's repetition of Dr. Parsa's testimony of a 20 percent risk of hematomas subsequent to an arteriography which was objected to during the trial, was objected to and this objection was sustained by the trial court. Any prejudice caused by that comment was cured.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.